UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank OGBUH (91–2094) and Samuel
Okoro (91–2117), Defendants–
Appellants.

Nos. 91–2094, 91–2117.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 15, 1992.

Decided Jan. 8, 1993.

Amy B. Hartmann (argued and briefed), Office of the U.S. Atty., Detroit, MI, for plaintiff-appellee.

Margaret Raben (argued and briefed), Dise & Gurewitz, Detroit, MI, for Frank Ogbuh.

Thomas V. Wilhelm (argued and brief), Bloomfield Hills, MI, for Samuel Okoro.

Before: MERRITT, Chief Judge; NORRIS and BATCHELDER, Circuit Judges.

MERRITT, Chief Judge.

Defendants Frank Ogbuh and Samuel Okoro appeal their jury convictions for drug offenses, asserting that evidence obtained in a warrantless entry into their Detroit hotel room should have been suppressed as the fruits of an unreasonable search and seizure under the Fourth Amendment. For the reasons expressed below, we agree, and therefore reverse.

## FACTS

Frank Ogbuh and Samuel Okoro are Nigerian nationals. In early November of 1990, they each bought a one-way airline ticket from Houston to Detroit. The tickets were purchased with cash, and within a short time of each other. Neither ticket bore the true name of either man. Due to bad weather, their connecting flight was delayed and the men spent the night in Indianapolis. They shared a hotel room in the name "Frank Johnson," the same name in which Ogbuh's ticket was issued. A call was made from the hotel room in Indianapolis to the Houston apartment of Mostafa Yosuf.

Okoro and Ogbuh arrived in Detroit the next day, November 6, and checked into Room 7 at the Hilltop Hotel, some 20 miles away from the airport. The room was registered for two people in Okoro's name. On the following day, several more calls were made from their hotel room to Yosuf's apartment in Houston.

Around 7:45 a.m. on November 8, 1990, Yosuf arrived at Detroit Metropolitan Airport. He was stopped by DEA agents. He told them he was going to the Marriott Hotel. He then consented to a search, and was relieved of 51.73 grams of heroin concealed in his underwear. The search also revealed several pieces of paper, two of which carried the Hilltop Hotel address and phone number. One also had "107" and the word "Frank" on it. When asked about the papers, Yosuf changed his story and said that he was going to the Hilltop Hotel to deliver the heroin to two Nigerians, one of whom was named Frank. He said he would be paid with money at the hotel or at another location.

Yosuf agreed around 8:40 a.m. to cooperate in a "controlled drop," in which the allegedly planned delivery would be made under the supervision and control of the government. The agents prepared a sham package similar to the one Yosuf originally had concealed on his person, and placed a tiny amount of the heroin in it. Yosuf was directed to call Ogbuh and Okoro to inform them of his arrival in Detroit, supposedly according to plan. The DEA agents then contacted a group of approximately ten agents to assemble near the Hilltop Hotel, at a "meet point." Some of the agents went to the hotel and corroborated Yosuf's story: There were two men from Houston staying in Room 7, which could be called from another room by dialing 107, and the room was registered under "Mr. Okoro," which the agent determined to be a "West African" name. Agent David Riddle concluded that there was insufficient time to seek warrants for the arrest of the two occupants of Room 7 or for a search of the room.

Some of the agents went to the hotel and set up surveillance in Room 6. Yosuf was taken to the hotel and allowed to check into another room, from which he called Ogbuh and Okoro. He then left his room and went to Room 7. He knocked and was admitted. The agents made a forced entry to the room without a warrant within one minute. It was now approximately 9:25 a.m., forty-five minutes after Yosuf had agreed to cooperate.

When they entered the room, Okoro was on the bed watching television, and Ogbuh and Yosuf were in the bathroom with the toilet cycling. The agents quickly determined the men's identities and arrested them. A wet plastic bag similar to the outer one used on the sham heroin package was recovered from the trash can in the bathroom. A search of Ogbuh's garment bag, lying near the bathroom, revealed several pieces of paper with numbers that government witnesses described at trial as

consistent with the apportioning of drugs for sale.

Defendants each were indicted by a federal grand jury on two counts: One count of conspiracy to possess with intent to distribute and to distribute 51.73 grams of heroin,[1] and one count of aiding and abetting possession with intent to distribute the same 51.73 grams.[2] They moved to suppress the evidence obtained in the warrantless entry and search of the hotel room. The case was referred to Magistrate Judge Komives for an evidentiary hearing, after which he recommended that Defendants' motions be denied. The district court approved the magistrate's Report and Recommendation and denied the motions. In the subsequent jury trial, all the evidence obtained in the warrantless entry and search was introduced to implicate Defendants in the alleged heroin trafficking scheme. The jury returned guilty verdicts on both counts for each defendant.

## ISSUES PRESENTED

Defendants assert that the federal agents did not have probable cause to enter the hotel room or to arrest them. They further contend that, even if probable cause existed, the facts of this case did not constitute exigent circumstances that would justify the failure to obtain a warrant. Because of our disposition of these issues, we do not reach Defendants' other claims raised on appeal.[3]

## PROBABLE CAUSE

■■■ We review a finding of probable cause using a de novo standard. *United States v. Williams*, 949 F.2d 220 (6th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 2308, 119 L.Ed.2d 229 (1992). The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Barrett*, 890 F.2d

855, 861 (6th Cir.1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)). At the time the agents entered the room, they had the following information: (1) Yosuf carried nearly two ounces of heroin into Detroit from Houston. (2) Yosuf had slips of paper with "Hilltop Hotel," the hotel's phone number and address, "107" and "Frank" written on them. (3) After being questioned at the airport about the papers, Yosuf changed his story and said he was going to the Hilltop Hotel to deliver the heroin to Room 7, to "two Nigerians," one of whom was named Frank. (4) Room 7 was registered for two occupants to a traveller from Houston named Mr. Okoro, a name indicating "West African descent," according to one agent. (5) By dialing 107 from another room at the Hilltop, one could reach Room 7.

Ogbuh's counsel at oral argument asserted that since the federal agents did not maintain constant supervision of Yosuf immediately prior to his entry into Room 7, they could not be sure he was carrying the sham package. The U.S. Supreme Court in *Gates* required only a "substantial chance" of "criminal activity," not certainty of incriminating physical evidence. We find these facts sufficient to establish probable cause for the search of Room 7 and the arrest of its occupants.

## FAILURE TO OBTAIN A WARRANT

The finding of probable cause by no means ends the inquiry, however. The agents entered Room 7 without having sought or obtained warrants for the entry and search of the room, or for the arrest of the Defendants. They justified this failure by asserting "exigent circumstances" that required immediate action before a warrant could be obtained.

"Absent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or

---

**1.** 21 U.S.C. §§ 841(a)(1), 846.

**2.** 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2.

**3.** Defendant Okoro challenged the sufficiency of the evidence used to convict him. Defendant

Ogbuh challenged several evidentiary and procedural rulings by the district court during the trial proceedings, as well as a post-trial sentencing enhancement under the U.S. Sentencing Guidelines.

search." *United States v. Morgan,* 743 F.2d 1158, 1161 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). Such warrantless entries and searches are "presumptively unreasonable," *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), and the burden of proof rests on the government to show exigent circumstances, *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970). "Those suspected of drug offenses are no less entitled to [Fourth Amendment] protection than those suspected of nondrug offenses." *United States v. Karo,* 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984).

■ In our review of suppression questions, the district court's factual findings are accepted unless they are clearly erroneous, but its application of the law to the facts is reviewed de novo. *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1512 (6th Cir.1988).

The district court adopted without comment the magistrate's finding that the warrantless entry was justified under two alternative grounds: exigent circumstances, and the doctrine of consensual entry as set out in *United States v. Paul,* 808 F.2d 645 (7th Cir.1986). We address each of these in turn.

To support his finding of exigent circumstances, Magistrate Judge Komives determined that (1) obtaining a search warrant would have required at least one hour, and (2) "that was an impermissibly long delay, given the facts of the case." A closer look at the events in question and the times at which they occurred is in order.

Komives found that Yosuf contacted the Defendants prior to his arrest at the Detroit airport. Documents were introduced at the Evidentiary Hearing showing that on his trip to Detroit from Houston, Yosuf traveled through Dallas and Cincinnati, leaving Dallas at 11:45 p.m. for Cincinnati and flying out of Cincinnati at 6:45 the next morning. According to Agent Taleb, Yosuf stated upon his arrest that he had called Ogbuh from Cincinnati to inform Ogbuh of his arrival time in Detroit. Taleb

also testified that Yosuf agreed at approximately 8:40 a.m. to participate in the controlled drop. Agent J.D. Riddle, who headed up the operation, testified at the Evidentiary Hearing that Yosuf called the defendants from the Detroit airport after he agreed to make the controlled drop, approximately an hour after he had deplaned. He was under the supervision of DEA agents at this time. The controlled delivery was made at 9:25 or 9:30; Yosuf's phone call to the Defendants from the Detroit airport would have had to occur at least half an hour earlier.

Agent Riddle testified at the Evidentiary Hearing that it takes "on average" 45 minutes to an hour to obtain a telephonic warrant. Magistrate Judge Komives later stated from the bench that "an hour is at least a bare minimum." He apparently accepted Agent Taleb's justification for their failure to seek a warrant:

> TALEB: Your Honor, based on my experience with getting warrants and my assisting other agents, it has always taken us an unusual amount of time to seek a warrant, especially at that time of the day. You have courtrooms who are busy with their dockets and trying to get an AUSA [Assistant U.S. Attorney], trying to get all the information together. Based on those reasons, we went ahead without a warrant.
>
> COURT: All right.

Evidentiary Hrg. 3/26/91, Tr. Vol. I at 48. Agent Riddle testified that the procedure in his jurisdiction was to contact an Assistant U.S. Attorney before calling a magistrate to obtain a telephonic search warrant. Komives stated from the bench that, when asked to issue a telephonic warrant, his first question is whether the agent has talked to an Assistant U.S. Attorney, although he also admitted that "theoretically, they could call me up directly."

The magistrate in his Report speculated that "any delay would likely have resulted in Okoro and Ogbuh becoming fearful that Yosuf had been intercepted. This would have resulted in aborting the delivery of two ounces of heroin." This language sug-

gests that another 15 or 20 minutes would have prevented the arrests.

 As has frequently been pointed out in the cases on exigent circumstances, *e.g., United States v. Morgan, supra,* the government may not erect a system of procedural delay and then use it as an excuse for not obtaining a warrant. That is what happened in the instant case, and we therefore disagree with the conclusions of Magistrate Judge Komives, as adopted by the district court. First, it is not clear that an hour would have been required to obtain the warrant by telephone had reasonable procedures been used. Delay due to any difficulty in locating an Assistant U.S. Attorney to approve the warrant request does not excuse abrogation of the requirements of the Fourth Amendment. Rule 41 of the Fed.R.Crim.Proc. does not require any such conversation with an Assistant U.S. Attorney. U.S. Attorneys should set up a system for fast action if this step is required. While such a policy may be desirable to help ensure that only worthy cases are brought to the attention of magistrates, the added costs of the policy in terms of delay may not be used as a justification for sidestepping entirely the warrant requirement under the rubric of "exigent circumstances."

The supervising DEA agent had efficient procedures in place so that he could assemble ten agents in 30 minutes to make an arrest and conduct a search. That process takes as much or more time and effort as obtaining a telephonic warrant. The question is one of motivation and incentive. If police have little incentive to obtain a warrant, they will not do so. The law must provide that incentive; otherwise, the warrant requirement of the Fourth Amendment will become a dead letter. *Payton v. New York, supra.*

Moreover, even if an hour were required to obtain the warrant, the government failed to demonstrate why that much time was unavailable. Yosuf spent nearly twelve hours traveling through four different airports before meeting the defendants, who had themselves been at the hotel for nearly two days. An additional delay could not have been considered peculiar under the circumstances. The agents had complete control over the timing of Yosuf's call to the defendants once he arrived in Detroit. Had they postponed the call and the ensuing operation just 15 more minutes, a full hour would have been available from the time Yosuf agreed to cooperate to the time the warrantless entry was made. "Police officials ... are not free to create exigent circumstances to justify their warrantless intrusions." *Morgan,* 743 F.2d at 1163.

The government has not overcome the presumption of unreasonableness of warrantless searches by demonstrating the need to act before obtaining a warrant. Neither the anticipated delay in obtaining a warrant due to DEA standard procedure, nor the timing of the events surrounding Yosuf's arrival in Detroit, justifies the magistrate's conclusion, as adopted by the district court, that the warrantless entry was justified. Although the magistrate's findings of fact were not clearly erroneous, his application of the law to the facts was in error.

## CONSENSUAL ENTRY

 As an alternative justification for his Recommendation that the motion to suppress be denied, the magistrate concluded that the entry was consensual in nature, under the theory set forth by the Seventh Circuit in *United States v. Paul,* 808 F.2d 645 (7th Cir.1986). He held that the defendants gave their consent or approval to the entry of the agents. In *Paul,* the government sent an informant into the defendant's home to purchase a bale of marijuana. Paul freely admitted the informant into his house, took him down to the basement and proudly displayed his marijuana. The informant immediately hit the button on an electronic signaling device, summoning government agents. The agents then forcefully entered the house, seized the drugs and arrested Paul.

The *Paul* court concluded that a warrant was not required, because Fourth Amendment protections were not implicated. The Fourth Amendment interest "has been fa-

tally compromised when the owner admits a confidential informant and proudly displays contraband to him." 808 F.2d at 648. Assuming without deciding that *Paul* is correctly decided, the case before us is readily distinguishable. The "contraband" that Ogbuh flushed down his hotel room toilet was brought into the room by Yosuf himself, not "proudly displayed" by either of the Defendants. Furthermore, Yosuf did not summon the agents; they entered forcibly of their own volition less than a minute after sending Yosuf into the room. It is a pure legal fiction to say that Defendants invited the agents into the room or gave some form of approval as they rushed through the door.

•

## CONCLUSION

The consequence of an illegal entry is to make unlawful any ensuing interrogations or searches. *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir.1990) (quoting *United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir.1980)). Because we conclude that the warrantless entry into Defendants' hotel room was illegal, and because their convictions were based on the evidence seized immediately following this entry, the convictions are REVERSED, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

BATCHELDER, Circuit Judge, concurring.

Although I concur in the majority opinion in this case, I write separately to express my disagreement with some of Chief Judge Merritt's rhetoric. It is not necessary to the decision in this case to express any opinions about the motives of the U.S. Attorney in setting up procedures for obtaining telephonic warrants, or the motives of the DEA in failing to obtain a warrant, or the general motivation of the police to comply with the requirements of the Constitution. Since those observations are not necessary, I do not believe they should be included in the opinion; in any event, they do not reflect my view of this case.

The evidence demonstrated that the DEA did not expect to be making the controlled drop. This was not a case in which a cooperating informant participated in a well-planned undercover operation. Here, the DEA stopped Yosuf at the airport and discovered that he was en route to make delivery of heroin to two people of whose existence the DEA had been entirely unaware until that moment. They persuaded him to cooperate with them, and, knowing that his arrival was expected imminently by those two people, the DEA hurriedly set up this controlled drop.

The DEA agent in charge had probable cause to believe that the suspects were engaged in criminal activity. The problem in the case was that he believed that he had to make a difficult choice: the agents could make a warrantless entry into the room and nail the suspects, or they could take the time to get the warrant but risk the suspects' fleeing before the warrant could be obtained. The agent opted not even to attempt to obtain the warrant. But for two reasons, the facts known to the agents, although providing probable cause, did not support a warrantless search. First, the heroin, which was essential to the criminal activity in which the suspects were believed to be engaged, was entirely within the control of the agents. Second, without better information about the likelihood that the suspects would become suspicious and flee, the agents had insufficient reason to assume that the hour or so it would require to obtain the warrant would foil the operation. It must be noted, however, that the first of these reasons, while arguing against the agents' having a basis for a warrantless search, provides the strongest impetus for their believing that time was of the essence, since, even if the agents had the suspects under surveillance, if the suspects did indeed become suspicious and attempt to flee before the drop was accomplished, there would likely be no evidence of the crime which would justify their apprehension.

In my view, therefore, the reason that the warrantless search must be found to be illegal is that the government simply did not demonstrate that the timing of this

operation was such that a warrant could not have been obtained sufficiently quickly to avoid the probable escape of the defendants. For that reason, I concur in the opinion.